```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-30-25
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

Dionysius Fiumano,

    Defendant.

14-CR-518-02 (CM)

### ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE OR REDUCTION OF SENTENCE

McMahon, J.:

Dionysius Fiumano is serving a sentence of 16 years' imprisonment for conspiracy to commit wire fraud and substantive wire fraud, in connection with a mortgage fraud scheme. (*See* Dkt. No. 101).

Before the Court is Fiumano's pro se motion for compassionate release under Title 18, United States Code, Section 3582(c)(1)(A). (Dkt 234). Fiumano argues that extraordinary and compelling factors warrant his release under Section 1B1.13(b)(6) on the basis that he received an extraordinarily long sentence of 192 months, he has served over 10 years of that sentence, and there is a gross disparity between the sentence that should have been imposed—which he claims is 108 to 135 months—and the 192-month sentence he is currently serving. Fiumano also argues that the sentencing factors set forth in Title 18, United States Code, Section 3553(a) warrant his release, particularly because he claims he has been rehabilitated.

The Government opposes the motion arguing that Fiumano has not shown extraordinary and compelling reasons for a sentence reduction, and that the sentencing factors at 18 U.S.C. § 3553(a) "weigh decisively against a sentence reduction." (Dkt 238).

The motion is denied.

Background

The defendant, Dionysius Fiumano, was a ringleader of a broad and exceptionally heartless mortgage modification scheme. He was the general manager of sales at Professional Legal Network ("PMG"), a California-based company that offered purported "mortgage modification" services. (PSR ¶¶ 25.) PMG convinced homeowners that it would work with their lenders to modify the terms of the homeowners' mortgages to make them more affordable. The defendant oversaw PMG's sales staff of dozens of telemarketers and managers. (PSR ¶¶ 25–26.)

From 2011 through 2014, the defendant, while working with and through his sales staff, perpetrated a scheme to defraud homeowners in dire financial straits who were seeking relief through mortgage modifications. Through a series of false and fraudulent representations, the defendant and his staff duped thousands of homeowners into paying thousands of dollars each in up-front fees in exchange for little or no mortgage modification services. In total, through their scheme, the defendant and his co-conspirators obtained approximately $31 million from more than 30,000 victim homeowners throughout the United States. (PSR ¶ 41.)

As part of the scheme, PMG purchased thousands of "leads," consisting of the names, addresses, and other contact information of homeowners who had fallen behind in making mortgage payments on their homes. (PSR ¶¶ 37–38.) At the defendant's direction, PMG sales staff then solicited these customers by email and by phone, and, using a series of fraudulent

2

misrepresentations, tried to lure them into sending money to PMG for purported mortgage modifications. The defendant, through his sales staff, regularly lied to homeowners, including by saying that (a) the homeowners were retaining a "law firm" and an "attorney" who would complete a mortgage modification application and negotiate aggressively on the homeowners' behalf with banks to modify the terms of the homeowners' mortgages; (b) the homeowners had been "pre-approved" or "prequalified" to receive a mortgage modification; (c) PMG employed underwriters who would calculate and guarantee the homeowners a new, modified rate and monthly mortgage payment; and (d) the up-front fees paid by the homeowners would be paid directly to the homeowners' lenders, to the attorneys to pay their fees, or to pay the purported "hard costs" of the modification. (PSR ¶ 27.) All of these representations were false. (*See, e.g.*, PSR ¶¶ 32–33, 42.)

On May 3, 2016, after a one-week jury trial, presided over by the late Hon. John F. Keenan, Fiumano was found guilty of conspiracy to commit wire fraud and substantive wire fraud. (*See* Dkt. No. 101.)

On September 15, 2016, Judge Keenan sentenced Fiumano to 16 years in prison.

Fiumano is currently incarcerated at Coleman Low FCI. He is scheduled to be release on June 4, 2029.

Compassionate Release Standard

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." *See* § 3582 (c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons or a

defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

If a defendant demonstrates that he has exhausted his administrative remedies with the BOP, the Court must then "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). However, any reduction of a defendant's sentence must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582 (c) (1) (A). These policy statements are set forth at § 1B1.13 of United States Sentencing Guidelines. Specifically, courts may consider a defendant's medical circumstances (§ 1B1.13(b)(1)), age (§ 1B1.13(b)(2)), family circumstances (§ 1B1.13(b)(3)), history of abuse (§ 1B1.13(b)(4)), and whether the defendant is serving an unusually long sentence (§ 1B1.13(b)(6)). There is also a "catchall provision," that allows a court to consider "any other circumstance or combination of circumstances that, when considered by themselves or together with any of the considerations in U.S.S.G. § 1B1.13(b)(1)–(4), "are similar in gravity" to such circumstances. (§ 1B1.13(b)(5)).

Here, Fiumano argues that he qualifies for relief under the unusually long sentence provision (§ 1B1.13(b)(6)). This section is applicable to defendants who (i) received an unusually long sentence, (ii) have served at least 10 years of the term of imprisonment, (iii) there has been a change in law that would produce a gross disparity between the sentence being served

4

and the sentence likely to be imposed at the time the motion is filed, and (iv) release would be consistent with defendant's individualized circumstances. U.S.S.G. § 1B1.13(b)(6).

Neither the amendment to the Guidelines nor the Circuit's decision in *Brooker* changed the mandate in § 3582(c)(1)(A)(i) that a court contemplating a defendant's release pursuant to that section must also consider the sentencing factors at 18 U.S.C. § 3553(a), to the extent they remain applicable, and determine whether they counsel for or against release. A court always retains discretion to deny a motion for compassionate release if, in its view, the § 3553(a) factors override what would otherwise present extraordinary and compelling circumstances for release.

Exhaustion of Administrative Remedies

Fiumano filed a request for a reduction in sentence with the BOP on September 20, 2024, which the bureau denied on October 2, 2024. (Dkt. #234, Exh. A).

Accordingly, the Court finds that Fiumano has exhausted his administrative remedies with the BOP, and his present motion is properly before the Court for adjudication.

Fiumano's Motion

Fiumano has failed to carry his burden to show an extraordinary and compelling reason that would justify reducing his sentence.

*Section 1B1.13(b)(6) Claim*

Fiumano argues that changes made between the 2013 and 2015 Guidelines manuals are qualifying changes in the law that could justify compassionate release under Section 1B1.13(b)(6) (the unusually long sentence provision). He claims that the 2015 version of the Guidelines was improperly used to calculate his sentence, and the changes between the 2015 Guidelines and the 2013 Guidelines (which he claims should have been used) resulted in an

5

improper 6-point enhancement to his Guidelines calculation under 2B1.1(2)(C). He also argues that the loss amount that the Court used in its Guidelines calculation was overstated, which improperly added four additional levels to his Guidelines calculation under 2B1.1(b)(1).

Section 1B1.13(b)(6) applies to situations in which a change in the law between the time a defendant was sentenced and the time a defendant files a compassionate release motion (i.e., a post sentencing change in the law) would have resulted in a reduced term of imprisonment. But that is not what Fiumano is arguing here. The alleged changes in the Guidelines that Fiumano says exposed him to a higher sentence were all made prior to his 2016 sentencing. Thus, his arguments about errors in his Guidelines calculation do not come within the ambit of Section 1B1.13(b)(6) because they are not based on any qualifying change in the law since his sentencing in September 2016. *See, e.g., United States v. Santos*, No. 01 Cr. 537 (ARR), 2024 WL 4212024, at \*3 (E.D.N.Y. Sept. 17, 2024) (change in law that occurred before sentencing could not be "the basis of the requisite change in the law" for purposes of compassionate release).

*Section 1B1.13(b)(5) Claim*

To the extent Fiumano's *pro se* motion could be interpreted as requesting relief under the "catchall" provision (§ 1B1.13(b)(5)), his motion would still fail because his Guidelines calculation was not erroneous.

Contrary to the Fiumano's claim, the 2015 Guidelines manual was the applicable to manual for Probation and the Court to use in calculating Fiumano's Guidelines range.

Under Section 1B1.11 of the Sentencing Guidelines—which is identical in all relevant versions of the Sentencing Guidelines—"the court shall use the Guidelines Manual in effect on the date that the defendant is sentenced," U.S.S.G. § 1B1.11(a), unless use of that manual "would

violate the *ex post facto* clause of the United States Constitution" (the "*Ex Post Facto* Clause"). As relevant here, the *Ex Post Facto* Clause prohibits laws that inflict "a greater punishment than the law annexed to the crime, when committed." *Peugh v. United States*, 569 U.S. 530, 530 (2013) (citing *Calder v. Bull*, 3 Dall. 386, 390, 1 L.Ed. 648). Accordingly, when the application of the Guidelines in effect at the time of sentencing would result in a more severe penalty than would application of the Guidelines in effect at the time the offense was committed, the *Ex Post Facto* Clause requires the application of the earlier version of the Guidelines instead of the current version. *United States v. Kilkenny*, 493 F.3d 122, 126–27 (2d Cir. 2007).

The 2015 Guidelines manual used for purposes of the defendant's sentencing became effective on November 1, 2015, and was effective until the 2016 Guidelines manual took effect on November 1, 2016. Use of the 2015 Guidelines for purposes of the defendant's sentencing did not violate the *Ex Post Facto* Clause because the defendant's Guidelines were no more severe under the 2015 Guidelines manual than they were under the 2013 Guidelines manual.[1]

The only difference between the 2013 and 2015 versions of the Guidelines manual that Fiumano argues affected him was a change in Section 2B1.1(2)(C); specifically, that he received a 6-point enhancement under that section of the 2015 Guidelines because his offense "resulted in substantial financial hardship to 25 or more victims" and that he would not have received that 6-point enhancement under the 2013 version of the Guidelines. Fiumano is correct that Section 2B1.1(2)(C) was changed in the 2015 Guidelines manual, decreasing the number of victims required for the enhancement to apply and requiring "substantial financial hardship," but the

---

[1] Based on the operative indictment, the criminal conduct occurred between January 2011 and May 2014. (See Dkt. 87 at 4, 3.) The 2013 version of the Guidelines manual was the effective version of the Guidelines manual in May 2014.

defendant would have received an equivalent enhancement under the same section of the 2013 Guidelines manual. Section 2B1.1(2)(C) of the 2013 Guidelines provided for a 6-point enhancement if the defendant's offense "involved 250 or more victims," which was clearly the case here. According to the pre-sentence report, "there were approximately 30,000 consumer victims." PSR ¶ 47

Thus, application of the 6- point enhancement under Section 2B1.1(2)(C) was proper.

Fiumano also argues that the 20-level enhancement he received under § 2B1.1(b)(1) (loss amount enhancement) was erroneous because it was based on a purportedly incorrect loss amount of $11,975,404. In support of that argument, he states that the "loss that was pronounced by the Court attributing to Mr. Fiumano" was "$1,975,404," which, according to the defendant, should have resulted in an only 16-level enhancement under 2B1.1(b)(1). (*See* Mot. at 11.)

The only purported evidence that the Fiumano cites in support of that claim is a typographical error in the sentencing transcript, in which the Court discussed the restitution amount owed to victims. (Sent. Tr. at 32:15-17 ("[F]or purposes of restitution, the estimate of the loss of $1,975,404 is appropriate").) But it is clear from the record that Probation calculated that $11,975,404 in losses were foreseeable to Fiumano. In the PSR, Probation applied a 20-point enhancement under Section 2B1.1(b)(1)(K) of the 2015 version of the Guidelines manual on the basis that the losses foreseeable to the defendant exceeded $9,500,000 but did not exceed $25,00,000. (PSR ¶ 63.)[2] Indeed, even at sentencing, the defendant contested that the losses

---

[2] The same 20-point enhancement would have been applicable under the 2013 version of the Guidelines that the defendant argues should have been used for sentencing because the losses foreseeable to the defendant exceeded $7,000,000 but did not exceed $20,000,000.

8

exceeded $9,500,000, but notably did not dispute that the losses exceeded $3,500,000, which would have resulted in an 18- point enhancement under Section 2B1.1(b)(1)(J). (Sent. Tr. at 31:19–25 (noting that $3,500,000 of losses is "not contested by defendant"). During sentencing, the Court declined to make a finding regarding the exact enhancement the defendant should receive under Section 2B1.1(b)(1). The Court explained that the exact loss amount was "immaterial" for purposes of sentencing because both parties agreed that the loss amount qualified for an at least 18-point enhancement under Section 2B1.1(b)(1), and the Court was going to "vary down from the guidelines" anyway. In any event, there is ample evidence in the record that the Court accepted Probation's $11,975,404 loss figure. At sentencing, the Court accepted Probation's stated offense level of 43, which resulted in part from the 20-point enhancement applied under Section 2B1.1(b)(1). (Sent. Tr. at 33:5 ("The total offense level is 43.").) The Court also said at sentencing that it was "ordering restitution in the amount of $11,975,404." (Sent. Tr. at 34:35.) Additionally, both the judgement of conviction and the order of restitution in this case note that restitution is ordered in the amount of $11,975,404.13. (Dkt. 129 at 5; Dkt. 130 at 1.) It, therefore, is amply clear that the portion of the sentencing transcript in which the Court is quoted as saying that $1,975,404 is the appropriate loss estimate for restitution is a simple typographical error in which a "1" was omitted from the typed figure.

Accordingly, to the extent that the Court did apply the 20-point enhancement at sentencing, any such application under 2B1.1(b)(1)(K) would have been consistent with the loss amount in this case and did not create extraordinary and compelling circumstances warranting Fiumano's release.

*The § 3553(a) Factors*

Even if Fiumano were able to show an extraordinary and compelling reason for a reduced sentence—and he has not—application of the Section 3553(a) factors would outweigh any justification for early release.

Fiumano engaged in serious criminal conduct — a mortgage fraud scheme that preyed on folks in financial *extremis*. As Judge Keenan remarked at sentencing:

> The case consisted of a callous and heartless mortgage modification scheme in which homeowners were defrauded by misrepresentations by the defendant, his co-conspirators and some over 60 people whom he supervised. Many of the victims, some 61 in number, lost their homes. . . . I indicated that I have received victim impact statements from over 100 victims, and I'm going to read from two of the victim impact statements so that anyone who reads this record has some idea of why I say this was a callous scheme and really a heartless one.
>
> "We lost our home and the last five years of our lives. We had to move to another state to get assistance from a relative just to get our heads above water. My children went from living in a 2,100 square foot home to an 800 square foot home, a mobile home, in a totally different state. We had to leave behind all of our belongings, including our clothes and the kids' toys, as well as our friends and family. Not only did we struggle with the physical loss, but my husband and I have both been diagnosed since then with anxiety and depression and are on medications daily for this. Our 12-year-old son is also in counseling for separation issues and anxiety as well."
>
> Another victim [writes]: "Two months after our refinance with Fiumano's company, we were forced to abandon the house, file bankruptcy and foreclosure, losing our home and our daughter all within a year's time." The daughter had died shortly before this. "Our sons hand painted our daughter's room. They will never be able to sit in her bedroom and feel the love they shared with her there. We lost everything. Had" -- and the government inserts "PMG," that's the company -- "only did what they actually" -- if they had only done is what she meant to write. "Had PMG only did" -- that's what's there -- "actually said what they were going to do and lowered our payment, we would still be there today" -- meaning in that home."

10

Sent Tr. at 32-33. And now this Court knows why Judge Keenan characterized Fiumano's crime as callous and heartless.

Although Fiumano Guidelines called for a sentence of 40 years in prison, Judge Keenan showed Fiumano a hefty measure of mercy, imposing a sentence of sixteen years: "I will vary downward from the guidelines. The defendant has been a good father, and the letters on his behalf, which I have read carefully, portray him most favorably." Sent. Tr. at 33. Fiumano got his break from Judge Keenan. While the Court recognizes that Fiumano has made good use of his time in prison (completing various BOP educational classes, and has maintaining steady employment; currently as his facilities chief commissary clerk), reducing his sentence now would not reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence. *See* 18 U.S.C. § 3553(a).

Accordingly, Fiumano's motion for compassionate release (Dkt. # 234) is denied.

Dated: July 29, 2025
New York, New York

September 29, 2025

COLLEEN McMAHON
United States District Judge